UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TALAL SALEM, et al.,

    Plaintiffs,

v.

MICHIGAN STATE UNIVERSITY, et al.,

    Defendants.
_____/

Case No. 1:19-cv-220

Hon. Hala Y. Jarbou

## **OPINION**

This case is about a Ph.D. program gone wrong. Plaintiffs Talal Salem and Salina Ramli are students working toward their doctoral degrees in the civil engineering program at Michigan State University (MSU). They claim that their academic advisor, MSU professor Dr. Parviz Soroushian, required them to work at his private company, Metna Co., under unsafe and abusive working conditions in exchange for little or no pay. They complied with his demands because they needed his approval to complete their degrees.

Plaintiffs brought this action against MSU, Soroushian, Metna, and the Chair of MSU's civil engineering program, Venkatesh Kodur, alleging various claims under federal and state law. Soroushian and Metna are the only remaining defendants at present. Before the Court is a motion by Defendants Soroushian and Metna to dismiss the federal claims in the complaint (ECF No. 92). For the reasons herein, the Court will grant the motion in part and dismiss one of the federal claims.

### **I. BACKGROUND**

The following facts are from the Plaintiffs' complaint. Ramli is from Malaysia. She enrolled in MSU's civil engineering Ph.D. program in January 2016, with funding from Malaysia's Ministry of Education. Before she enrolled, Soroushian allegedly told her that completion of a

research project was a requirement for her degree and that she would have to conduct her doctoral research at Metna. Soroushian told her that MSU had an agreement with Metna to allow students to conduct their research there. Metna was allegedly a participant in MSU's "Curricular Practical Training (CPT) Program," which allowed students to work at Metna in order to receive training that is "either required for their degree or that is integral to the student's curriculum and taken for research credit." (Am. Compl. ¶ 61, ECF No. 38.) Ramli was not aware that Soroushian owned Metna.

Ramli began working at Metna during her first semester at MSU. She continued working there approximately eight hours a day, five days a week, for more than two years. She received no pay for her work. To support herself and her two children, Ramli worked at a bakery from 3 a.m. to 8 a.m., before showing up for work at Metna at 9 a.m.

In the spring of 2018, a laborer hired by Metna allegedly sexually harassed Ramli, constantly following her around and calling her "sweetie." (*Id.* ¶ 76.) Another tried to hit on her. Salem reported Ramli's concerns to Soroushian, but he did nothing about them.

Ramli tried to switch to another academic advisor, but she was unsuccessful. She allegedly complained to another professor in the engineering program about being overworked and forced to perform difficult, physical labor at Metna. This professor was allegedly aware of similar complaints from other students; however, the professor refused to accept Ramli as an advisee unless she obtained permission from Soroushian.

Salem is from Jordan. He enrolled in the same doctoral program in August 2017. He started working at Metna after Soroushian told him that Soroushian's students worked there. Salem obtained authorization from MSU's CPT Program to work at Metna and began his work in October 2017. Like Ramli, Salem was not aware that Soroushian owned Metna.

Soroushian initially promised to pay Salem $300 per month. In November 2017, Soroushian required Salem to work at Metna full time, up to seven days per week, in exchange for "a few hundred dollars more per month." (Am. Compl. ¶ 97, ECF No. 38.) Salem often worked "all hours of the night[.]" (*Id.* ¶ 98.) Metna compensated him for only a "fraction" of the time he worked. (*Id.* ¶ 100.)

Salem was not able to keep up with his studies because of his work for Metna. When he asked for time off to prepare for an exam, Soroushian refused, reminding Salem that Soroushian was a member of the committee responsible for reviewing Salem's doctoral work.

Plaintiffs' work at Metna involved "arduous physical labor, including lifting and transporting heavy equipment, as well as milling, mixing and casting concrete." (*Id.* ¶ 112.) Both Plaintiffs allegedly suffered physical ailments as a result of their labor. Salem sustained multiple shoulder dislocations, which required a surgery. Ramli suffered back pain and knee pain. Soroushian allegedly used his position as their academic advisor and reviewer to pressure Ramli and Salem to perform such work for Metna, even though it was unrelated to their research interests and their dissertations.

In addition, Soroushian allegedly abused Plaintiffs verbally. He frequently yelled at Ramli, denigrated her, and told her that she did not deserve a Ph.D. On one occasion, he screamed at her, raised his fist at her, and slammed it down on the desk next to her. To Salem, Soroushian stated, "You have no brain," "You are a walking wall," "I should smash you," "I should hang you," and "[You] should go back to Jordan." (*Id.* ¶¶ 131-32.)

Soroushian allegedly treated the American graduate student who worked at Metna differently. Soroushian did not shout at him or disparage him. Soroushian did not require him to work more than 20 hours per week. Soroushian allowed him to set his own schedule.

Plaintiffs allegedly complained to Kodur, the department chair, about being forced to work long hours and perform difficult labor for Metna. Ramli also complained that she was not receiving any pay for her work. And Salem complained that the work was unrelated to his degree. Salem also told Kodur that he wanted a different position but Kodur allegedly told him that no other positions were available.

Kodur told Soroushian about Plaintiffs' complaints but did not investigate further or take any other action. Kodur was not wholly an impartial intermediary. He had financial ties to Metna and Soroushian. Kodur worked for Metna as a consultant, employee, and subcontractor. Soroushian engaged him to work as an investigator on government-funded research projects awarded to Metna.

MSU allegedly had prior knowledge of some of Soroushian's improper practices. In 2011, it prohibited Soroushian from "'acting in ways that enriched himself at the expense of . . . the University students.'" (*Id.* ¶ 180.) Soroushian and MSU had agreed upon a "Conflict of Interest Management Plan" regarding Soroushian's other company, Technova. (*Id.* ¶ 181.) In 2016, they updated that plan to include Metna. The plan prohibited Soroushian from "serving as the chairperson of any dissertation or thesis committees for students who are employed concurrently by his company." (*Id.* ¶ 183.)

In July 2018, the Dean of the College of Engineering initiated an investigation into Soroushian, hiring a law firm to conduct the investigation. That same month, Plaintiffs learned that MSU had removed Soroushian as their advisor, which allegedly meant that they would have to begin their doctoral research projects anew. Consequently, Plaintiffs contend that Defendants' actions delayed progress in their doctoral programs by approximately three years.

The results of MSU's investigation allegedly confirmed the abusive conditions under which Plaintiffs had labored and the discriminatory treatment that they had received. It allegedly found that Soroushian was able to "isolate the students from the university campus, require them to work excessively with little or no pay, verbally abuse them, and repeatedly threaten them with academic consequences[,]" treating them like "underpaid and abused workers[.]" (*Id.* ¶ 225 (quotation marks omitted).) It also found that Soroushian had engaged in "unwelcome conduct" based on Plaintiffs' national origin and that the conduct was so "severe, persistent and pervasive" that it unreasonably interfered with their work and educational experiences. (*Id.* ¶ 215.) And it found that Soroushian had specifically "targeted" advisees like Plaintiffs, who have "a self-funded status from foreign countries," taking advantage of their lack of knowledge of United States law and their "lack of ability to advocate for themselves." (*Id.* ¶¶ 219, 222, 226 (quotation marks omitted).)

The federal claims against Soroushian and Metna arise under the following statutes: the Trafficking Victims Protection Reauthorization Act (TVPA), 18 U.S.C. §§ 1589, 1590, 1595 (Counts I - III); 42 U.S.C. § 1983 (Count VI); Title VI, 42 U.S.C. § 2000d (Count VII); Title IX, 20 U.S.C. § 1681 (Count X); and the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 206, 207 (Count XVI). Defendants seek dismissal of those claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Alternatively, Defendants ask for summary judgment on those claims under Rule 56(a) of the Federal Rules of Civil Procedure.

## II. STANDARDS

A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim if the complaint fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a

5

plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

Assessment of the complaint must ordinarily be undertaken without resort to matters outside the pleadings; otherwise, the motion must be treated as one for summary judgment under Rule 56. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

Although Defendants style their motion as one for dismissal under Rule 12(b)(6) and/or for summary judgment under Rule 56, the Court will consider the motion under Rule 12(b)(6) only. It appears that little or no discovery had been conducted when Defendants filed their motion, yet discovery is necessary to flesh out the facts underlying some of Plaintiffs' claims. (*See* Pls.' Rule 56(d) Decl., ECF No. 93-1.)

## III. ANALYSIS

### A. TVPA

Plaintiffs claim that Metna and Soroushian obtained Plaintiffs' labor through "force, fraud and coercion," leading them to believe that they would suffer "serious harm" if they did not comply. (Am. Compl. ¶ 233.) The TVPA makes it a criminal offense to obtain labor through force and to knowingly recruit or obtain forced labor. The forced-labor provision, 18 U.S.C. § 1589, makes it a crime to "knowingly provide" or "obtain" the labor or services of a person by one of the following means:

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process; or
>
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]

18 U.S.C. § 1589(a).

The trafficking provision, 18 U.S.C. § 1590, makes it a crime to "knowingly recruit[], harbor[], transport[], provide[], or obtain[] by any means," a person for forced labor. 18 U.S.C. § 1590(a).

The TVPA provides a civil remedy. It permits a victim of forced labor or labor trafficking to bring a civil action against the "perpetrator" or against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation" of the statute. 18 U.S.C. § 1595(a).

Defendants argue that Plaintiffs have not stated a claim under the TVPA because their claim is based on Soroushian's abusive comments and implied threats to hinder progress on their

7

doctoral degrees, resulting in financial harm and delayed employment opportunities. Defendants contend that Soroushian's statements are not enough, especially when considering Plaintiffs' age and education, for a reasonable person in their position to feel compelled to perform labor.

Plaintiffs respond that the issue is whether Soroushian threatened them with "serious harm." In the TVPA, "serious harm" means

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to *compel* a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c)(2) (emphasis added). This term is

> intended to be construed with respect to the individual circumstances of victims that are relevant in determining whether a particular type or certain degree of harm or coercion is sufficient to maintain or obtain a victim's labor or services, including the age and background of the victims.

H.R. Conf. Rep. No. 106-939, at 101 (Oct. 5, 2000). Congress specifically amended the TVPA in 2000 to include "nonphysical forms of coercion." *United States v. Calimlim*, 538 F.3d 706, 714 (7th Cir. 2008). Congress intended § 1589 "to address the increasingly subtle methods of traffickers who place their victims in modern-day slavery, such as where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence." H.R. Conf. Rep. 106-939, at 101.

Plaintiffs contend that a reasonable person with their backgrounds would feel compelled to continue working for Soroushian to avoid termination from the doctoral program at MSU. Plaintiffs were foreign students attempting to obtain doctoral degrees within a limited timeframe. Ramli, for instance, was under contract with the Malaysian government to complete her degree by December 2019, in exchange for scholarship funds of more than $100,000. Failure to complete

8

her degree within the allotted timeframe would require her to repay the funds she had received. She alleges that Soroushian was aware of the scholarship requirements. (Am. Compl. ¶ 278.)

Defendants rely on *Muchira v. Al-Rawaf*, 850 F.3d 605 (4th Cir. 2017), in which the Court of Appeals for the Fourth Circuit held that a plaintiff had not demonstrated that the defendants had knowingly obtained her services by means of "serious harm or threats of serious harm" under the TVPA. *Id.* at 618. According to that court, forced-labor situations typically involve

> squalid or otherwise intolerable living conditions, extreme isolation (from family and the outside world), threats of inflicting harm upon the victim or others (including threats of legal process such as arrest or deportation), and exploitation of the victim's lack of education and familiarity with the English language, all of which are "used to prevent [vulnerable] victims from leaving and to keep them bound to their captors."

*Id.* at 618-19 (quoting *United States v. Callahan*, 801 F.3d 606, 619 (6th Cir. 2015)).

In *Muchira*, however, the plaintiff

> came to the United States willingly. The Saudi family[, her employer,] never physically abused her, nor did they ever threaten her or her loved ones with physical harm. They never physically restrained or impeded her from leaving her employment situation. They never threatened her with arrest, deportation, adverse immigration consequences, or other legal consequences if she left their employment.

*Id.* at 619-20. The plaintiff's claim was based solely on strict household rules, as well as "long work hours and verbal reprimands" that caused psychological harm in the form of "depression, acute stress, and panic attacks[.]" *Id.* at 620.

The court in *Muchira* noted that "'Section 1589 is 'intended to address *serious* trafficking, or cases where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence.'" *Id.* at 618 (quoting *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011)). Not all "'bad employer-employee relationships or even bad employer-immigrant . . . relationships will constitute forced labor.'" *Id.* at 620 (quoting *Dann*, 652 F.3d at 1170). For similar reasons, Defendants contend

9

that Plaintiffs have not alleged sufficient facts to plausibly show that they were subjected to forced labor.

The Court agrees. The complaint contains few facts indicating that Soroushian compelled Plaintiffs' labor through serious harm or threats of such harm. Much of the complaint centers on Soroushian's *authority* as Plaintiffs' advisor to compel Plaintiffs to work, rather than specific threats of harm. (*See* Am. Compl. ¶¶ 54, 104, 107, 133, 148, 150.) Plaintiffs clearly believed that they needed to comply with Soroushian's demands in order to be successful in the graduate program, but that compliance does not amount to forced labor. Likewise, Soroushian's abusive comments and actions, which did not threaten specific harm for Plaintiffs' failure to continue their labor, did not create a forced-labor environment. That conduct suggests an abusive working relationship, which, as other courts have stated, is not a violation of the forced-labor statute.

Even if Soroushian had expressly, rather than implicitly, threatened to impede Plaintiffs' advancement in their program for failing to meet his work demands, those threats would not have *compelled* Plaintiffs' labor. Plaintiffs' working conditions may have been more arduous than the typical graduate experience in their program, and failure to complete their programs may have subjected Plaintiffs to a risk of significant financial burden and professional delay, but those consequences are not what compelled Plaintiff to continue their labor.

A university graduate program is different from other work environments. It holds out the promise of valuable intangible benefits in exchange for a significant investment of time, money, and unpaid (or underpaid) labor on the part of the student. The benefits received by the student in exchange for these sacrifices are not immediate financial rewards but training, experience, knowledge, and academic credentials. Because of the immediate costs and the delayed benefits, attempting to complete such a program can be financially risky. Indeed, for many, that attempt is

unsuccessful. It is no secret that many graduate students never complete their degrees at all. *See* Council of Graduate Schools, *Ph.D. Completion and Attrition: Analysis of Baseline Program Data from the Ph.D. Completion Project* (2008) (reporting an attrition rate of 14.4 percent of civil engineering Ph.D. students after ten years, with a cumulative 10-year attrition rate of over 20 percent for all doctoral engineering programs), available at https://cgsnet.org/sites/default/files/ phd_completion_attrition_baseline_program_data.pdf. And even a successful effort may not pay off. The graduate may be saddled with thousands of dollars of debt for loans that were used to pay tuition and living expenses.

Thus, what might look a bit like forced labor in another context (e.g., little or no pay, long hours, grueling work, and the possibility of significant financial or reputational harm from failure to meet a supervisor's demands) is simply an accepted feature of our education system, which assumes that the long-term benefits of the experience and the degree outweigh the risks and costs borne by the students. The key difference between this situation and forced labor is that a victim of forced labor remains in servitude to avoid negative consequences (i.e., "serious harm") inflicted or threatened by their employer. In other words, the consequences compel the labor; without them, the victim would not remain under the employer's power. A graduate student, on the other hand, accepts the risk of negative consequences in order to obtain substantial benefits. The benefits are what motivate the labor, not the consequences; without them, the students would not enter or continue in the program.

In other words, Plaintiffs were in a position like that of many graduate students, particularly those who are financially strapped and find that the unreasonable expectations of an academic advisor stand in the way of achieving their career goals. Granted, Plaintiffs' experiences may have been somewhat unique in that their advisor apparently abused his position to require Plaintiffs to

11

work for his private company, ostensibly for his own benefit rather than for theirs. Nevertheless, what motivated Plaintiffs' labor was not the threat of harm itself, but that which motivates any graduate student: the desire to complete their degree programs and attain their career goals. The Court does not believe that Congress intended to criminalize an academic advisor's abuse of his authority to compel his students to perform unreasonably difficult, or even self-enriching, labor.

Furthermore, there is a difference between harm that arises as a natural consequence of the employee's decision to cease work and harm that would not arise as a natural consequence but is intentionally inflicted or threatened by the employer if the victim refuses to continue working. A claim of forced labor typically involves the latter. Otherwise, it is difficult to say that the harm *compelled* the labor rather than *motivated* it because the loss of employment almost always results in some financial harm due to lost wages.

Cases similar to this one are distinguishable on that basis. In *Calimlim*, for instance, the plaintiff's employers confiscated her passport, made her think that they were the only ones who could legally employ her, and told her she would be arrested and deported if anyone discovered her. *Calimlim*, 538 F.3d at 713. They did not disclose that they were breaking the law by employing her or that they could have legalized her status. Thus, they made her think that she had no choice but to stay or face arrest, which might not have been the natural result of leaving her employment if she had known the truth about her situation.

In *Dann*, the employer told the plaintiff that if she were to leave, she would not receive the wages to which she was entitled and would owe a debt for expenses incurred by the employer. That threat of harm was sufficiently serious for the plaintiff because she was an immigrant who possessed no money; however, the salient point is that the harm involved something more than the loss of *future* wages, which is the natural and expected result of losing any job. Otherwise, she

would have been in the same position as any other poor or penniless employee threatened with job loss, and whose labor would not be considered "forced" under the TVPA, even though the job loss would be financially and personally devastating.

Other cases cited by Plaintiffs are distinguishable for the same reasons. *See, e.g.*, *Paguirigan v. Prompt Nursing Emp. Agency, LLC*, 286 F. Supp. 3d 430 (E.D.N.Y. 2017); *Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 790 F. Supp. 2d 1134 (C.D. Cal. 2011). In *Paguirigan*, the employer required its employees to pay a termination fee as high as $25,000 and sued them if they quit. *Paguirigan*, 286 F. Supp. at 438. In *Tanedo*, the employer imposed a $5,000 debt on the employees and threatened to deport them if they quit. *Tanedo*, 790 F. Supp. 2d at 1146. The financial and immigration consequences in those cases went beyond the usual consequences of losing a job.

Importantly, the TVPA is not a *forced employment* statute; it does not require employers to shield financially desperate or otherwise vulnerable employees from the expected consequences of losing their jobs. Even where those consequences might be severe for a particular individual, labor performed under threat of such consequences does not thereby become forced or compelled.

Similarly, as unreasonable as Soroushian's demands may have been, the TVPA did not require him to shield Plaintiffs from the natural consequences of losing the opportunity to complete their degree programs by failing to meet his expectations. Otherwise, almost any student relying on loans to pay for their education could claim that academic work requirements unlawfully compel labor by threatening serious financial and reputational consequences—and in the case of foreign students, immigration consequences—for failure to meet those requirements.

Finally, unlike the defendants in *Calimlim* and *Dann*, Defendants did not intentionally create or control the most serious negative consequence of Plaintiffs' failure to meet Defendants'

13

work demands. For instance, Defendants were not involved in Ramli's scholarship arrangement with the Malaysian government and had no control over how that arrangement would be enforced. Accordingly, for all the foregoing reasons, Defendants did not truly compel Plaintiffs' labor through an express or implied threat that could subject them to financial and other consequences for failure to meet Soroushian's demands. Thus, Plaintiffs do not state a claim against Defendants under the TVPA.

### B. 42 U.S.C. § 1983

Count VI of the amended complaint asserts a claim against Soroushian[1] under 42 U.S.C. § 1983. To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009). Here, Plaintiffs allege that Soroushian deprived Plaintiffs of their constitutional right to equal protection because he treated foreign graduate students less favorably than others.

Defendants respond that Soroushian did not act "under color of state law." According to Defendants, Soroushian's alleged actions took place at Metna, in his role as a private citizen and president of Metna. Defendants do not dispute that professors at state colleges like MSU are state officials in some circumstances. However, they contend that Soroushian's conduct in this case was not taken under color of state law because it took place off campus, outside his role as professor. Thus, they contend that he was acting as a private citizen.

---

[1] Defendants apparently believe that Plaintiffs assert this claim against Metna as well, but the complaint expressly states that this claim is asserted against Soroushian and another individual who is no longer a defendant. The complaint does not mention Metna as a defendant to this claim.

14

In order for a private party's conduct to be under color of state law, it must be "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).  There must be "a sufficiently close nexus between the State and the challenged action of [the defendant] so that the action of the latter may be fairly treated as that of the State itself." *Skelton v. Pri-Cor, Inc.*, 963 F.2d 100, 102 (6th Cir. 1991) (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).  The conduct of a private party will be deemed to constitute state action only if it meets one of three narrow tests.  The first is the symbiotic relationship test, or nexus test, in which the inquiry focuses on whether "the State had so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise." *Jackson*, 419 U.S. at 357-58.  Second, the state compulsion test describes situations "in which the government has coerced or at least significantly encouraged the action alleged to violate the Constitution." *NBC v. Commc'ns Workers of Am.*, 860 F.2d 1022, 1026 (11th Cir. 1988); *accord Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 170 (1970).  Finally, the public function test covers private actors performing functions "traditionally the exclusive prerogative of the State." *Jackson*, 419 U.S. at 353; *accord West*, 487 U.S. at 49-50.  *See generally Lugar*, 457 U.S. at 936-39 (discussing three tests).

Here, Soroushian was a state official.  He was employed by MSU as a professor.  Moreover, according to the facts alleged in the complaint, his actions toward Plaintiffs were entwined with his role as their professor and academic advisor.  Plaintiffs allegedly worked for Soroushian's company at his recommendation and for the purpose of conducting research to fulfill the requirements of their degree programs at MSU.  Indeed, Metna allegedly had an agreement with MSU under which MSU's students could work at Metna to satisfy MSU's curricular requirements.  And Plaintiffs labored under Soroushian's demands not because they were regular employees of

15

Metna but because they were students under Soroushian's academic supervision. Furthermore, Plaintiffs allege that Soroushian unfairly discriminated against them compared to *another student* at MSU. Thus, even if Soroushian's conduct crossed over into his ostensibly private role as manager of Metna, the facts alleged draw a sufficiently close nexus between his discriminatory conduct and his role as a state official to fairly attribute his conduct to the state. The Court is not persuaded by Defendants' contention that the off-campus location of Soroushian's conduct necessarily renders it private conduct rather than state action.

### C.  Title VI

Count VII of the amended complaint asserts a claim against Metna under Title VI, which prohibits discrimination based on "race, color, or national origin" to exclude a person from, participation in, or being denied the benefits of, "any program or activity receiving Federal Financial assistance." 42 U.S.C. § 2000d.

Defendants contend that Plaintiffs do not state a claim against Metna because it is not a "program or activity" receiving federal assistance. Title VI defines "program or activity" to include "an entire corporation, partnership, or other private organization" where the financial assistance is extended to the entity as a whole, and where that entity "is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation[.]" 42 U.S.C. § 2000d-4a(3)(A). Alternatively, for private corporations, Title VI defines "program or activity" to include "the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended[.]" *Id.* ¶ 2000d-4a(3)(B).

According to the amended complaint, Metna received federal financial assistance through MSU's "SBIR Program." (Am. Compl. ¶ 290.) SBIR stands for "Small Business Innovation Research." 15 U.S.C. § 638. It is a federal government funding program that "encourage[s]

domestic small businesses to engage in Federal Research/Research and Development (R/R&D) with the potential for commercialization." https://www.sbir.gov/about.[2]

Defendants contend that Plaintiffs' action boils down to a claim for employment discrimination, and that "Title VI does not provide a judicial remedy for employment discrimination unless providing employment is a primary objective of the federal aid; or unless that discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid." *Stewart v. Simpson Cnty. Bd. of Ed.*, No. 88-5957, 1989 WL 25541, at *1 (6th Cir. Feb. 24, 1989). Defendants argue that Plaintiffs do not plead that the primary objective of the SBIR funding received by Metna was for the purpose of providing employment, or that Plaintiffs were the primary beneficiaries of the federal funding.

Plaintiffs respond that their claim concerns discrimination in education opportunities, not employment. Indeed, the complaint alleges that Metna subjected Plaintiffs to harassment, abusive conditions, and strenuous labor demands, resulting in delays in Plaintiffs' ability to complete their doctoral programs. Also, Metna required more of them than it did other students, inhibiting Plaintiffs' advancement in their coursework and in the research necessary to attain a degree. These allegations arguably pertain to discrimination in an education-related program or activity, rather than discrimination in employment.

Defendants respond that if education is the basis for the claim, then Plaintiffs have not alleged that Metna is an entity principally engaged in the business of providing "education, health care, housing, social services, or parks and recreation." *See* 42 U.S.C. § 2000d-4a(3)(A). This argument comes too late, however. The Court generally does not consider new arguments raised

---

[2] Plaintiffs object to consideration of evidence about the SBIR program in a motion under Rule 12(b)(6); however, the Court can take judicial notice of the contents of a federal statute, 15 U.S.C. § 638, and a government website that summarizes those contents, without running afoul of Rule 12(b)(6).

for the first time in a reply brief. *See Overstreet v. Lexington-Fayette Urban Cnty Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("An argument raised for the first time in a reply brief will not be considered by this Court.").

Moreover, the statutory provision cited by Defendants appears to apply only where the financial assistance is extended to the entity as a whole, as opposed to a specific location. That is a factual question not suitable for resolution at the dismissal stage. Suffice it to say, Defendants failed to provide a persuasive reason for dismissing the Title VI claim. And to the extent that the Title VI claim requires a particular relationship between the funding received by Metna and Plaintiffs' work, further factual development is necessary to resolve that relationship. Plaintiffs' allegations are adequate to proceed.

### D. FLSA

Defendants argue that Plaintiffs do not state a claim under the FLSA because their allegations do not satisfy the "primary benefit test" for distinguishing between employees entitled to wage protection under the FLSA and trainees or students who are not entitled to such protection. This test focuses "on the benefits flowing to each party"; it ascertains "which party derives the primary benefit from the relationship." *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 529 (6th Cir. 2011). If the purported employer receives the primary benefit of the educational relationship, then the relationship is subject to the FLSA's requirements. "Factors such as whether the relationship displaces paid employees and whether there is educational value derived from the relationship are relevant considerations that can guide the inquiry." *Id.* Such factors might include

> the plaintiffs' lack of expectation of payment; the educational value, both tangible and intangible, of the tasks under scrutiny; and the displacement of paid employees to the [employer's] competitive benefit in the commercial marketplace[;] . . . the mandatory or voluntary nature of the tasks; the relationship of the work at issue to the school curriculum, state regulations, and the school's stated mission and educational philosophy; the type of work performed in the corresponding real-

world commercial setting; and the academic credit received by the plaintiffs for the work.

*Eberline v. Douglas J. Holdings, Inc.*, 982 F.3d 1006, 1018 (6th Cir. 2020). In short, the relationship "is to be determined on a case-by-case basis upon the circumstances of the whole business activity." *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984).

Recently, the Sixth Circuit has clarified that the primary benefit test can apply to a *portion* of a relationship between the student and employer. *Eberline*, 982 F.3d at 1014. Otherwise, an educational employer could "extract uncompensated labor from students that is noneducational so long as the value of that labor to the [employer] does not exceed the value of the overall relationship to the students." *Id.* at 1017.

Here, Plaintiffs have alleged that their degree program required them to conduct research at Metna, that Plaintiffs regularly worked 40 or more hours per week (in contrast to another graduate student who was required to work only 20 hours per week), that Plaintiffs received little or no pay for their work, and that much of the work Metna required of Plaintiffs (some of which was physically taxing) was for Metna's benefit and was unrelated to their program. Indeed, after MSU removed Soroushian as Plaintiffs' advisor, Plaintiffs allegedly had to begin some of their research anew. These allegations are sufficient to state a claim under the FLSA. In other words, they provide a plausible basis for inferring that Metna was the primary beneficiary of Plaintiffs' work, or at least a portion thereof. Thus, Plaintiffs state a claim under the FLSA.

## V. CONCLUSION

For the reasons herein, the Court will grant Defendants' motion to dismiss in part and deny it in part. The Court will grant the motion solely as to Plaintiffs' claim under the TVPA. In all other respects, the motion will be denied.

An order will enter consistent with this Opinion.


Dated:  April 13, 2021                             /s/ Hala Y. Jarbou
                                                   HALA Y. JARBOU
                                                   UNITED STATES DISTRICT JUDGE